OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1914.

---

(*Continued from Volume* 263.)

---

ALICE BURT et al., by JOHN HOUGENDOUGLER, Their Guardian, Appellants, v. ADELBERT P. NICHOLS.

Division Two, February 23*, 1915.

1. **IDENTITY OF DEAD BODY: Rings.** When the front doors of the lodging house were broken open the unrecognizable dead body of a woman, entirely naked and bare-footed, was found on the first floor, in the vicinity of the fiercest fire in the building. Plaintiffs' mother regularly lodged there, in a room on the second floor, opening into the hall, into which led a stairway from the first floor. Certain rings were clasped tightly in the woman's hand, which were identified by a man, to whom one of them belonged, and who had seen them in the possession of plaintiff's mother only about four hours before the fire. Her employer testified he saw her body on the porch after the fire. *Held*, a case for the jury on the question of identity.

---

Note.—Decided January 4, 1915. Motion for rehearing filed; motion overruled February 23, 1915.

Burt v. Nichols.

2. **LODGING HOUSE: Prima-Facie Case.** Proof that deceased had been rooming at the house for six months prior to the fire, that eighteen or nineteen persons lodged there and that it was usually full, made out a prima-facie case that the house was being used as a lodging house and that the landlord knew of that use.

3. ————: ————: **Ownership.** It being admitted or shown in evidence that defendant was the owner of the house at the time of the fire, the burden did not rest upon plaintiffs thereafter to show how long he had been the owner, but if he was not liable, because of sixty days of grace - granted by the statute, the matter of establishing that defense rested on him.

4. ————: **Fire Escape: Waiver: Assumed Risks.** The deceased woman by becoming a lodger in the lodging house and remaining there for six months or more did not waive compliance on the owner's part with the statute and ordinance requiring fire escapes. Compliance with an express statute cannot be waived by one whose death or injury is due to another's failure to comply with its plain requirement. The duty of the owner to place the fire escape upon the lodging house was not a contractual obligation, between deceased and the owner, nor between him and her landlady, and the doctrine of assumption of risks has no application to such a case.

5. ————: ————: **Substantial Compliance.** Wherever the arrangement of the halls, porches and windows cannot be held out-of-hand, as a matter of law, as equivalent facilities for fire escapes, the question as to whether they constitute a substantial compliance with the statutory or ordinance requirements for fire escapes of named sized and construction, becomes one for the jury, as it was in this case.

6. ————: ————: **Proximate Cause: Contributory Negligence as Affirmative Defense.** It is negligence *per se* in the owner of a lodging house to neglect and fail to comply with the statute and ordinances requiring such buildings to be equipped with fire safety appliances; but this fact alone does not inevitably fix liability; for defendant may avoid that by proof either of contributory negligence or of lack of proximate cause. But where contributory negligence is not shown by plaintiff's own evidence, it is an affirmative defense, and a matter for the jury; and where the death of plaintiffs' mother in the fire which destroyed the lodging house in which she was asleep, can only be logically imputed either to the owner's negligence to provide proper fire escapes, or to her own contributory negligence, and the facts to establish her contributory negligence do not so clearly appear from plaintiffs' proof that no reasonable person can draw two inferences therefrom, the court should not com-

pel a nonsuit, but the case should go to the jury, even though the proximate cause be dark.

7. ————: ————: ————: **Res Ipsa Loquitur.** Where fire safety-appliance laws are violated, and death, unexplained except by the physical facts, occurs as the result of the burning of a lodging house unequipped with the required appliances, the rule of *res ipsa loquitur* should be invoked to take the case to the jury.

Appeal from Jackson Circuit Court.—*Hon. Joseph A. Guthrie,* Judge.

REVERSED AND REMANDED.

*Charles R. Pence, Claude Hardwicke* and *Frank Yeoman* for appellants.

(1) It was the duty of the defendant, as owner of the premises, to provide his building with fire escapes, and he is liable for injuries to a lodger due to a failure to construct such fire escapes. Yall v. Snow, 201 Mo. 511; Johnson v. Snow, 201 Mo. 450. (2) The plaintiffs could not justly be required to prove their case by direct and positive evidence or beyond a reasonable doubt. It was enough to prove facts from which an inference might fairly and reasonably be drawn, that the mother's life would have been saved, had the means, which the law required, been provided for her escape from the building. It was enough to show a reasonable probability that she might have escaped, had there been a fire escape constructed according to law. Buesching v. Gas Co., 73 Mo. 219; Soeder v. Railroad, 100 Mo. 680; Settle v. Railroad, 127 Mo. 336; Meadows v. Ins. Co., 129 Mo. 93; Cambron v. Railroad, 165 Mo. 558; Yongue v. Railroad, 133 Mo. App. 152; Johnston v. Railroad, 150 Mo. App. 318; Lawrence v. Ice Co., 119 Mo. App. 316; 1 Greenleaf Ev. (14 Ed.), p. 22; Daniels v. Railroad, L. R. 3 C. P. 216, L. R. 5 H. of L. 45; Thayer's Cases

on Ev., pp. 137, 142; 2 Ency. Ev. 956. (3) The question of the proximate cause of an injury is ordinarily one for the jury; and this is true "even when the facts are undisputed if they are of such a character that different minds might draw different conclusions from them." Lamb v. Railroad, 147 Mo. 186; Johnston v. Railroad, 150 Mo. App. 319; Railroad v. Kellogg, 94 U. S. 469; Shearman & Redfield on Negligence (5 Ed.), sec. 55. (4) The defendant was guilty of negligence *per se,* in violating the statute, which was enacted for the protection of those who were in the situation of plaintiffs' mother, and the evidence that such negligence was the proximate cause of her death was sufficient to submit the case to the jury. Murray v. Railroad, 101 Mo. 242; Brannock v. Elmore, 114 Mo. 59; Lamb v. Railroad, 147 Mo. 185; Johnston v. Railroad, 150 Mo. App. 318; Turner v. Railroad, 78 Mo. 578; Hayes v. Railroad, 111 U. S. 228; Railroad v. McDonald, 152 U. S. 262; Railroad v. Stout, 17 Wall. (U. S.) 657; Schlereth v. Railroad, 115 Mo. 104; Pennsylvania v. Troop, 19 Wall. (U. S.) 125; Williams v. Railroad, L. R. 9 Exch. 157; Couch v. Steele, 3 Ellis and Black, 402. And the following cases, all of which are fire escape cases, some of them having been decided since the decision of this case in the lower court: Wiley v. Mulledy, 78 N. Y. 310; Landgraf v. Kuh, 188 Ill. 484; Carrigan v. Stillwell, 97 Me. 247; Arms v. Ayer, 192 Ill. 601; Rose v. King, 49 Ohio St. 213; Gorman v. McArdle, 22 N. Y. Supp. 479; Arnold v. Starch Co., 194 N. Y. 42; Adams v. Iron Co., 117 Tenn. 470; Cittadino v. Schackter, 85 Atl. (N. J.) 174; Kohn v. Clark, 84 Atl. (Pa.) 692. (5) In the absence of any evidence that the plaintiffs' mother was unwilling or unable to have availed herself of the use of the fire escape, had there been one, and thereby to have saved her life, the facts that the building had no fire escape, as required by the statute, and

that she was a lodger in the building and lost her life in the fire, were sufficient, had there been no other evidence (as there was in this case) to prove that the violation of the statute was the proximate cause of her death. Her death was one of the consequences against which the statute was intended to provide. Her injury and death was one of the results which it was the purpose of the statute to prevent. 21 Am. & Eng. Ency. Law (2 Ed.), pp. 480, 481-482; Turner v. Railroad, 78 Mo. 580; Notes to Gilson v. Canal Co., 36 Am. St. 815; Pennsylvania v. Troop, 19 Wall. (U. S.) 125; Williams v. Railroad, L. R. 9 Exch. 157.

*E. D. Ellison* and *Sebree, Conrad & Wendorff* for respondent.

The burden of proof was upon the plaintiffs not only to prove negligence or the violation of a statutory duty by the defendant, but also that such negligence was the proximate cause of the death of Jennie Burt Hoffmaister. The case rests upon the law of negligence generally, the statute relating to fire escapes having no such provision as the railroad law, shifting the burden of proof from the plaintiff to the defendant. It is said in Shearman & Redfield on Neg., sec. 27, that the doctrine relied upon in some earlier cases, and by plaintiffs' counsel here, that a breach of statutory duty was evidence not only of negligence, but also that such negligence caused the injury complained of, is now abandoned. And in the notes to the case of Gilson v. Canal Co., 36 Am. St. 802, 817, cited by appellants, the law is now stated to be that "the question of natural consequence does not, it would seem, arise in this class of cases, the only condition of recovery being proof that the breach of the statute was the efficient cause of the injury." 21 Am. & Eng. Ency. Law, 480; Byerly v. Light Co., 130 Mo. App.

603; Goransson v. Riter-Connelly Co., 186 Mo. 307; Dunphy v. Stock Yards, 118 Mo. App. 506; Warner v. Railroad, 178 Mo. 125; Smart v. Kansas City, 91 Mo. App. 586; Smith v. Bank, 99 Mass. 605; Smillie v. Dollar Store, 47 Mo. App. 406; McGrath v. Transit Co., 197 Mo. 97; Harper v. Terminal Co., 187 Mo. 575; Breen v. Cooperage Co., 50 Mo. App. 202.

FARIS, P. J.—This is an action by plaintiffs, who are the infant children of Jennie Burt Hoffmaister, for damages accruing by reason of the latter's death in the burning in Kansas City of a building used as a lodging house. The negligence complained of was the failure of defendant to equip the burned building with a fire escape and other safety appliances, as required by the statutes of Missouri and the ordinances of Kansas City.

The building in question was a three-story brick building, or to be a little more exact, a two-story building with a mansard roof constituting a third-story and consisting of four small rooms in said third, or mansard roof, story. From the second-story window to the ground was sixteen feet and eight inches. There was a stairway in the middle of the house leading from the first floor to the second floor, the foot of which stairway was distant five feet from the front door. On the south side of this stairway there were three rooms on the second floor, the middle one of which was occupied by deceased. The stairway led up into a hallway on the second floor, which hallway was five feet and ten inches wide. This hallway was not continuous to the east or front end, but led into a small bedroom, which we may call a hall bedroom. This hall bedroom had a window opening out upon a front porch, which porch was about eleven feet from the ground, some ten feet wide and practically as long as the house was wide. To the rear, through the hall

of the second floor from which the down-going stairs led, there was a small window about a foot and a half wide and four feet and a half long and some twenty-nine inches from the floor. This window led to a porch on the rear of the building, which porch was about thirteen feet from the ground.

The room occupied by the deceased woman had an outside window, which, as stated, was a little over sixteen feet from the ground. There was a door leading from this room to the second story hall, which hall we have already described. Just west and to the rear of the room of deceased was the bath room, connecting on the south side with the rear part of said hall. There was also a door between the room of deceased and the front room, which said front room had a window opening on to the flat roof of the long front porch; but there is no showing as to whether this door was locked, nor is there any showing as to whether the door to the hall bedroom was locked. As to the latter it is said there was a cot therein and that no one was in this room when the firemen got to it, but there is not a syllable in the record, showing whether or not the door to the hall bedroom was opened, or closed, or whether it was occupied, or unoccupied when the fire broke out.

The fire seems to have commenced in the basement and to have broken through the ground floor, near the foot of the stairs, into the hall at an early stage and to have raged there more fiercely than at any other point. It was discovered shortly after five o'clock on the morning of February 1, 1908. The fire department reached the scene of it only about one minute after the giving of the alarm. The front doors were broken down and the body of the deceased was found lying near the foot of the stairs in front of the double-doors on the first floor and in the vicinity of the fiercest fire in the building. The body was entirely naked and bare-footed, and so badly burned as to be unrecogniza-

ble.  Identification thereof is shown largely by certain
rings which were found tightly clasped in the dead
woman's hand.  These rings were identified by one
Paul McDonald, to whom one of the rings belonged,
and who had seen the rings in the woman's possession
the night preceding the fire, and only about four hours
before her death.

When the firemen reached the house smoke was
coming from every window in the building.  At the
time of the burning of this building there were some
nineteen or twenty persons rooming, or lodging in it.
Of these, some seven or more were in the third story.
Besides Mrs. Hoffmaister four others were burned to
death.  These four were occupants of the small rooms
in the third story.  All of the persons occupying rooms
on both the first and second floors, except Mrs. Hoff-
maister, escaped, either by jumping out of windows, or
by climbing through the windows onto the porches,
which latter were not injured by the fire.

The evidence is undisputed that there was no out-
side metal stairway or fire escape, nor any scuttles
leading to the roof and connecting with the iron stair-
way, nor any signs upon any doors or windows indi-
cating a fire escape or indicating a means of exit in
case of fire.  It was likewise undisputed that the proper
place for a fire escape, had the building been equipped
with such, was at, or near, either the east or west end
of said second story hall at the front or the rear.

It was admitted that defendant was the owner of
the house at the time of its destruction.  It was leased
by a woman by the name of Higgins and used, as stated,
as a rooming or lodging house.  For how long a pe-
riod it has been so used does not definitely appear, but
it does appear that deceased had roomed in this house
for about six months.

There was no evidence in the case as to when de-
ceased first learned of the fire or that she knew the
location thereof.  No one saw her after the witness Mc-

Donald left her at about one o'clock, until she was found by the firemen. No one heard her, so as to identify her voice or her cries, except that the witness Kingery, who occupied a room on the first floor near the stairs, and who states that he heard something or someone coming down the stairs after the fire had burnt through his door from the hall.

Both the statutes and the city ordinances were relied on. Two sections of the ordinance will become pertinent. They are as follows:

"*When sufficient.* Any building provided with outside stairways or fire escapes approved by the chief of the fire department and constructed of wrought iron or steel and having balconies with suitable metal railings at each floor or landing, and firmly secured to the outer walls, shall be deemed to be provided with sufficient facilities for escape in case of fire as required. The owner of any building which is provided with stairs or ladders on the outside shall construct such stairs or ladders with railed landings at each story above the first, and connect them with each story by doors or windows. No person shall place, permit or allow any obstruction on any outside stairway or ladder or fire escape. All fire escapes shall be accessible from halls, or in buildings now erected, by passing through one glass door marked 'Fire Escape.'"

"*Scuttle, How Made and Where.* All brick buildings more than twenty feet in height shall have scuttle frames not less than two by three feet in size; and covers, or bulk heads and doors on the roof, made of or covered with some incombustible material; and every scuttle shall have a stationary stepladder, and every bulkhead shall have stairs furnished with sufficient guard or hand rail ready for use at all times, and in a tenement house such scuttle or bulkhead shall never be locked, but may be fastened with a hook on the inside."

Deceased was employed as a waitress in a restau-rant. She had been twice married; the plaintiffs here are the children of the first marriage, their father being dead. Her second husband, Hoffmaister, was living at the time of her death, but he and she were separated and she had a divorce suit pending against him. Hoffmaister failing to sue for six months, plaintiffs brought this action. A trial was had herein once before, but a demurrer to the evidence therein being sustained, plaintiffs took a nonsuit. Afterward, and within one year this suit was begun. A trial was had herein, but at the close of the evidence for the plaintiffs the trial court instructed the jury to find for defendant. Thereupon plaintiffs again took an involuntary nonsuit herein, with leave to move to set the same aside. This motion to set said nonsuit aside was duly filed, and being overruled plaintiffs have duly perfected this appeal. The question before us is then solely whether or not there was enough evidence to go to the jury. To this point we shall direct our attention in the subjoined opinion.

## OPINION.

We do not understand it to be seriously contended by defendant that any other phase of sufficiency to make out a case is lacking, except that of evidence of causal connection, or proximate cause. In short, defendant sustains the action of the court below in taking this case from the jury upon the theory that there is nothing in the evidence to show that defendant's failure to equip the burned building with a fire escape and other safety appurtenances called for by statute and the city ordinance was *causa causans* of the death of plaintiffs' mother. But lest we err in this we will notice other points briefly.

I. We do not need to find aught except that there was on all points necessary to be proved by plaintiffs

to make out their case, sufficient evidence, or infer-
ences to be deduced circumstantially from

Identity.

the evidence, to make out a prima-facie
case. We think this condition is met so as to take the
case to the jury on the question of the identity of the
body found naked, bare-footed and burned near the
foot of the stairs on the first floor, with that of plain-
tiffs' mother. For the witness Davis, her employer,
says he saw her body on the porch, and the witness
McDonald identified the rings found in the dead wo-
man's hand as belonging to him and to the woman, and
he swears that he last saw deceased with these rings
some four hours before. This, we think, made a case
for the jury on identity.

II. Upon the question of the use of the burned
building as a lodging house, so as to bring it within
the purview of the statute and the city ordinances,
there can likewise be left no debatable ba-

Lodging
House:
Ownership.

sis for a contrary contention. The own-
ership of the building was admitted to be
in defendant; but it is urged, not seri-
ously, however, we apprehend, that the burden was on
plaintiffs to show how long defendant had owned the
house, and also that defendant knew the house was be-
ing used as a lodging house. The proof was that de-
ceased had been rooming at this house for more than
six months; that the house was usually full, and that
some eighteen or nineteen other persons lodged there-
in. The prima-facie presumption which the triers of
fact were entitled to draw from this was that the owner
would in this time have learned, and did in fact know,
of such use. Upon the other phase, that plaintiffs were
compelled to show how long prior to the fire defend-
ant had been the owner of the building, we are like-
wise not impressed. The prima-facie fact of owner-
ship at the time of the fire being shown, it became a
matter of defense if defendant, and not some one else

—his predecessor in title—was liable. Whether the sixty days of grace originally provided when this act was first passed (Sec. 5, p. 220, Laws 1901) applies in a civil action, we do not decide, for it cuts no figure here, because the proof shows that deceased had been rooming at this house for over six months and so if it had been converted from a dwelling into a lodging house only six months before, the sixty days of grace had long passed.

III.   Neither are we impressed with the insistence of defendant that the deceased by becoming a lodger in this house and by remaining therein as such for more than six months, thereby waived compliance on defendant's part with our statutes and with the city ordinances. Such a defense seems very similar to that which is elsewhere in other jurisdictions called assumption of risk. Usually, if not universally, this doctrine is bottomed on contract, express or implied, and connotes a relation of privity between him who invokes the doctrine and the one against whom it is invoked. The dead woman was a lodger of Mrs. Higgins. She had a contract no doubt with Mrs. Higgins and the latter had one also no doubt with defendant; but no contractual relation or privity is shown to have subsisted between defendant and deceased which would serve as a basis for the assumption of risk doctrine. Neither do we think deceased waived the compliance by defendant with the law or the city ordinances. We do not believe that a waiver of such compliance could ever arise against one injured or killed by default in complying with a plain statute. If waiver can be bottomed upon the fact of occupancy of a building which is not equipped, but which both an ordinance and a statute require to be equipped with fire safety appliances, from the mere fact of occupancy for a few hours, or days, or weeks, or months, then the statute is emasculated and utterly worthless. This

*Fire Escape: Waiver.*

same defense has been urged in practically every case in every jurisdiction in which actions of this sort have been brought, but we have not been able to find one case in which the defense has been held to be absolutely good. [Adams v. Inn Co., 117 Tenn. 470; Cittadino v. Schackter, 85 Atl. 174; Willy v. Mulledy, 78 N. Y. 310.] Recovery was refused pursuant to so-called waiver, but which was, on the facts, a mixed matter of waiver and contributory negligence, in the case of Armaindo v. Ferguson, 55 N. Y. Supp. 769, wherein plaintiff, for six months a guest in a hotel, knowing her room was not equipped with a rope for descending, as the statute required, but likewise knowing that there was an exterior metal fire escape just outside the window of her room, nevertheless jumped to the street and was hurt.

In the case of Adams v. Inn Co., supra, at page 481, the Supreme Court of Tennessee, refusing to lend its concurrence to such defense, said:

"The plaintiff did not waive the duty which the defendant owed to him under the ordinance as an occupant of the hotel, nor assume the risks incident to its occupation in its then condition. The duty of the defendant to place the fire escape upon its hotel was not a contractual obligation, and the doctrine of assumed risks has no application to this case. The ordinance is a police regulation, made for the protection of human life, and in the interest of that portion of the public occupying hotels and lodging houses. Public policy requires that duties of this kind be discharged, and that all consequences of a failure to do so shall follow. The individuals who are affected cannot suspend the law by waiver or express contract. The plaintiff had the right to presume that the defendant would obey the law and would provide the fire escapes, and to continue to occupy his room upon the faith of such presumption."

In this latter view we are constrained to concur.

IV. It was urged in argument and is likewise touched upon slightly in the brief, that the physical facts in the instant case, show such an arrangement of the halls and back and front porches, the windows leading thereto and the heights of these porches and windows from the ground, as to constitute substantial compliance with the statute, so far as equivalent facilities for escape are concerned. The facts shown are not so nearly similar to the statutory requirements as to permit us to hold out of hand as a matter of law that the approximate compliance shown was an absolute defense. The most that can be said of this contention is that whenever substantial or approximate compliance is relied on, the question whether the compliance shown reasonably met the statutory requirements, becomes a jury question. [Gorman v. McArdle, 22 N. Y. Supp. 479; Kohn v. Clark, 236 Pa. St. 18.] The courts cannot weigh such matters. The statute requires the outside iron stairs to reach within nine feet of the ground, and the city ordinances required that certain signs, indicating the location of the fire escape, be put upon doors leading thereto; also other requirements are specified in the statute. [Sec. 1, p. 251, Laws 1903.] The facts we set out show both how near and how far defendant came from meeting these requirements by the adventitious presence of so-called equivalents. Since so evident a noncompliance is present upon a literal view, the question of substantial compliance is for the jury, and is not a matter to be resolved by the court.

V. But the difficult point in the case and the point most seriously urged, is whether upon the facts shown, regard being had to the statute violated, it appears as a matter of law that the defendant's failure to equip the building with a fire escape and the required fire safety appliances, was the proximate cause of the woman's death.

*Substantial Compliance.*

*Proximate Cause.*

As a major premise it must be conceded that it was negligence *per se* in defendant to neglect and fail to comply with the statute and ordinances of Kansas City requiring the building to be equipped with fire safety appliances. Yet this fact alone does not inevitably fix liability. Such may be escaped by the proof of either contributory negligence, or of lack of proximate cause. Since contributory negligence is an affirmative defense, where it is not shown by plaintiffs' own evidence, it very clearly cannot be invoked to aid defendant, in a case like this, which was taken from the jury. So there is left for defense on defendant's side of the case but the one point of proximate cause.

Ordinarily it is well-settled, if not almost fundamental, that negligence will not be presumed, but that it must be proven. In some cases, however, the burden or degree of care enjoined is such that the bare showing of an injury and the immediate producing cause thereof, throws the burden of disproving negligence upon the defendant. [Partello v. Railroad, 240 Mo. 122; Nagel v. Railroad, 169 Mo. App. 284.] But here in the instant case negligence is present beyond cavil. Likewise the fact of injury is shown in such wise as to take the case to the jury.

We can readily appreciate a case wherein the facts themselves would show lack of proximate cause. [Radley v. Knepfly, 104 Tex. 130; Armaindo v. Ferguson, 55 N. Y. Supp. 769.] But we think that such condition ought ordinarily to appear from facts shown affirmatively, and not be deduced as inferences favorable to defendant only from a state of nonspeaking facts from which contrary inferences can just as well be drawn. Here a state of negligence on defendant's part is shown; a woman is found burned to death. No witness saw her or heard her when she died, and none speaks a syllable as to the manner in which she met her appalling and horrible fate. Was it possible for her to have reached the little window in the rear of the hall

and to have passed through the same to safety? Were the nature and place of the fire such as to have permitted her to do this? Was it possible for her to have thrown herself from the side window of her room sixteen feet and more to the earth and to safety? Could she have passed through the adjoining room east of hers to the porch and to safety? Could she have passed through the little hall bedroom to this porch? To all these doubtful things and to all these questions and two-sided inferences, do the facts and defendant's negligence drive us. The answer to most of them would seem to be that the police regulations set down in the statute and the ordinances were made and designed to save panic-stricken persons, in a moment of deadly peril, from the errors of a judgment dethroned by terror. It may be said that if there had been a fire escape there she might not have been able to get to it. Conceded, and likewise conceded that such an affirmative showing would have relieved defendant from liability. [Radley v. Knepfly, supra.]      Other possible theories of escape for her may be conjured up now from hind-sight when coldly conned over years after, which did not occur to her frightened, frenzied senses, dulled by slumber and awakened to confront instantly the skeleton specter in his grisliest and most horrible aspect. The presumption is that she did not wantonly throw away her life; that she tried to save herself, rather than that she committed suicide. In truth, the showing that she died with all her little jewelry clutched in her hand, shows that her thought was to escape and live and not to die. Considering all these things and all these diverse inferences, were they to be resolved by the court as matters of law or were they for the jury? Besides, where logically does the burden of proof fall? If negligence be admitted, and suicide be eliminated, as they both must be here upon the facts, what caused this woman to lose her life? We think the answer must be that she lost it either on account of

the negligence of the defendant, or by reason of her own contributory negligence. If she lost it by the negligence of defendant, the case should have gone to the jury; if she lost it by her own negligence then the facts thereof were matters of affirmative defense. And where such facts do not so clearly appear from the plaintiffs' own proof as that no reasonable person can draw two inferences touching them, the case is for the jury. [White v. Railroad, 250 Mo. 476; Linderman v. Carmin, 255 Mo. 62.] We have pointed out some of the contrary inferences which we think reasonable men might well deduce from the circumstances in evidence.

For these reasons and others which occur to us, but which we will not take up space to discuss, we are not able to concur with a view of the law (in those cases where defendant, by actual criminal negligence in failing to comply with simple police regulations devised in consonance with the spirit of humanity, has brought about a holocaust which snuffed out many lives) which, in effect, holds it possible for those only to sue who are crippled, but which so seals up the facts and the law when the lips of the dead are sealed, that no action may be brought for their death. Such a view penalizes the innocent for the benefit of the guilty. The law ought not to allow the guilty defendant to be the sole financial beneficiary of this woman's horrible death. Those regulations are intended to protect the lives of humble lodgers and homeless roomers, ill able from comparative friendlessness and poverty to protect themselves.

The provision in the city ordinance that a sign with the words "fire escape" thereon should be provided to indicate the way leading to such appliance, was designed to so habituate occupants to the location of the means of exit provided that the use thereof should become, as we say in the vernacular, "second

nature," and so guard against the dangers arising from excitement and panic. The physical facts here bear sad and silent but eloquent witness to this mental process "strong in death." For this woman in her panic, sought and used the only means of egress, to-wit, the central wooden stair, that she had ever seen or known or used in her six months' occupancy of this fire-trap.

The rule of *res ipsa loquitur* has been invoked in cases which upon analogy are similar in all material aspects to the conditions found here. For example, it was held to apply to an injury received by a clerk of a shipper upon a railroad who went to the railroad yards to inspect a shipment of goods consigned to his employer. [Tateman v. Railroad, 96 Mo. App. 448.] There, as here, no contractual relation or privity by contract subsisted between the plaintiff and the defendant. Plaintiff, there as here, was merely upon the premises as an implied licensee. [Tateman v. Railroad, supra; Blanton v. Dold, 109 Mo. 64; Gallagher v. Edison Co., 72 Mo. App. 576; Houston v. Brush & Curtis, 66 Vt. 331.] We think these reasons suffice to uphold the rule; but if they do not, and if to hold thus makes necessary the creation of a new precedent, then we ought, in a case of such crying necessity, to create it. Neither the day for the making of new precedents is past, nor is the field thereof already occupied to exclusion. Therefore, we hold that where, as here, these fire safety-appliance laws are violated and death, unexplained except by the physical facts, occurs by fire in the burning of a building not equipped with the required appliances but which is by law required so to be, the rule of *res ipsa loquitur* should be invoked to take the case to the jury, where all inferences *pro* and *con* and all matters of contributory negligence can be resolved under proper instructions by the triers of fact.

Let the case be reversed and remanded to be re-tried in accordance with these views. It is so ordered. *Walker* and *Brown, JJ.,* concur.